Stephen ROANE and Margot
Roane, Plaintiffs,

v.

GREENWICH SWIM COMMITTEE;
Walter F. McDermott; and S2 Yachts,
Inc., d/b/a/ Tiara Yachts, Defendants.

No. 01 Civ. 2254(CSH).

United States District Court,
S.D. New York.

July 9, 2004.

John J. Sullivan, Thomas Earl Willough-by, Hill, Rivkins & Hayden, L.L.P., New York, NY, for Plaintiffs.

Helene Teper, Jacobowitz, Spessard, Garfinkel & Lesman, Esqs., Michael J. Pearsall, Jacobowitz Garfinkel & Lesman, New York, NY, for Defendants.

## MEMORANDUM OPINION AND ORDER

HAIGHT, Senior District Judge.

In this tort action arising out of injuries suffered by a swimmer during the course of a distance swimming event and a related rescue attempt, defendants move for summary judgment and to preclude the testimony of plaintiffs' expert witness. Plaintiffs oppose these motions and cross-move for partial summary judgment to strike certain defendants' affirmative defenses of waiver and assumption of risk. This Opinion resolves all these motions.

## I. BACKGROUND

On July 8, 2000, plaintiff Stephen Roane participated in the Greenwich Point One Mile Swim, organized and operated by defendant Greenwich Swim Committee ("GSC"), and held in the Long Island Sound, near Greenwich, Connecticut. The swim was considered an entry level event. No prior checks of a participant's swimming skills were made.

Conditions that day were less than optimal for a swim. The temperature was colder than expected for the season and the water choppy. Some swimmers experienced waves of two to three feet during the course of the race. Nevertheless Roane and over 200 other swimmers congregated at a public beach known as Tods Point on Long Island Sound to begin the event.

Roane swam for approximately one-eighth of a mile when he began swallowing seawater and became severely distressed. Realizing that he could not continue in the race, Roane swam to a nearby buoy and signaled to a lifeguard in a nearby kayak for help. The lifeguard paddled in Roane's direction and directed him to straddle the front of the kayak with his arms and legs. Roane was then transported to a support boat operated by defendant Walter McDermott.

McDermott was the owner of a 27 foot, twin engine Tiara 2700 Continental model motor vessel named the *Sea Breeze*. About one month prior to the swim, a GSC member contacted McDermott to request assistance in setting up and dismantling the race course, as well as monitoring the swimmers and potentially lending any needed assistance. He agreed to participate, and was assisted by two people. Before the race, GSC member George Friend deployed balloons to mark the course. Friend was on board the *Sea Breeze* when Roane attempted to board the vessel. Laura Warzola, an emergency medical technician, was also on board.

McDermott's vessel was designed and built by defendant S2 Yachts, Inc., d/b/a/ Tiara Yachts ("S2") in 1984. McDermott bought the boat second hand in 1997. The boat was powered by two Mercury inboard/outboard engines or sterndrives.[1] One part of each sterndrive was located inside the vessel's stern, while the other part, the outdrive—which is the propeller and drive shaft—protruded out through the stern. Each engine was operated independently from the other, by its own throttle and gear shifting mechanism.

Also at the rear of the boat was a so-called swim platform, which was nine feet wide and extended approximately thirty inches from the stern. A fold-down ladder was positioned at the center of this platform. By McDermott's estimation, the two outdrive portions of the sterndrives

---

1. A sterndrive is an encapsulated propulsion mechanism located at the rear of the boat.

were three to four feet apart, with the fold-down ladder between the outdrives.

McDermott was having trouble with his vessel prior to the race. The problem began after he beached the boat in order to pick up Warzola. He shifted both engines into reverse to back the vessel off the beach. While doing so, he raised both engines into the "trimmed up position" in order to give himself maximum clearance above the sea bed. There is no indication that he ever lowered the engines again up until the time of Roane's injury.

After traversing a sufficient distance through the water, McDermott attempted to shift the boat's engines to forward gear. However, due to a faulty throttle cable, the port engine remained in reverse. With his twin engines now moving in opposite directions, the boat could only proceed in a circle. McDermott shut down the impaired port engine and proceeded to operate the vessel using the starboard engine only.

Returning to Roane's attempted rescue, the kayak (with Roane straddling its bow) approached the *Sea Breeze* from her port side. Friend threw a rope in Roane's direction, which after some difficulty Roane was able to grab. Roane was then instructed to board the boat by throwing his leg up on to the platform. Roane was not instructed to nor did he attempt to board by way of the fold-down ladder. The vessel's starboard engine continued to run at this time. However, McDermott asserts that the engine was running on neutral since the time Roane grabbed hold of the rope.

Due to several factors including the rocking of the vessel, the rough seas, the slipperiness of the platform, and his own fatigue, Roane could not pull himself onto the boat. The best he could do was bring his right leg on top of the platform. Then, after several failed attempts, Roane was suddenly drawn beneath the vessel. It

was at that time that he was struck by parts of the boat beneath the surface of the murky waters.

Having been struck by the boat, Roane was in a great amount of pain. The pain was concentrated in parts of his lower abdomen and testicles. After a moment of indecision and uncertainty, Friend jumped into the water to assist Roane, while McDermott shut down the starboard engine completely and also entered the water to assist Roane. Friend discovered that Roane's loose fitting swimming trunks had gotten entangled in the port propeller. He used a knife to cut the shorts free.

By that point, the crew abandoned all attempts to get Roane on board McDermot's vessel. Instead, lifeguards came to the scene on surfboards to take him ashore. When he arrived onshore, he was placed in an ambulance and taken to Stamford Hospital where he was treated for his injuries.

In their amended complaint, plaintiffs allege three causes of action. Their first cause of action is a claim for injuries suffered by Stephen Roane as a result of GSC's and McDermott's negligence. Their second cause of action is for those injuries, sustained as the result of design and/or manufacturing defects by S2 in respect of the boat *Sea Breeze*. Their third cause of action is a loss of services and consortium claim by plaintiff Margot Roane, Stephen Roane's wife.

There are two threshold issues I must resolve prior to reaching the substantive motions: first, whether general maritime law applies to this case; and second, which state law should apply (to the extent it does not conflict with maritime law). After examining the standard of review for summary judgment motions, I will resolve these threshold issues and then decide the substantive motions.

## II. STANDARD OF REVIEW

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). *See also Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The party moving for summary judgment bears the burden of demonstrating the absence of a genuine issue of material fact; this burden is satisfied if the moving party "can point to the absence of evidence to support an essential element of the nonmoving party's claim." *Goenaga v. March of Dimes Birth Defects Foundation,* 51 F.3d 14, 18 (2d Cir.1995). If there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the non-moving party, then summary judgment should not be granted. *Chambers v. TRM Copy Centers Corp.,* 43 F.3d 29, 37 (2d. Cir.1994). The substantive law will identify which facts are material. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202(1986) ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment").

In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538, (1986). However, a party resisting summary judgment "may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial". Fed.R.Civ.P. 56(e). As Judge Motley aptly stated in *Eppen-*

*dorf–Netheler–Hinz v. Enterton Co.,* 89 F.Supp.2d 483, 485 (S.D.N.Y.2000):

> [J]udges ... [are not] required to submit a question to a jury merely because some evidence has been introduced by the party having the burden of proof, unless the evidence be of such a character that it would warrant the jury in finding a verdict in favor of that party.... [I]n every case, before the evidence is left to the jury, there is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed.

(citing and quoting *Anderson,* 477 U.S. at 251, 106 S.Ct. 2505). *See also Western World Ins. Co. v. Stack Oil, Inc.,* 922 F.2d 118, 121 (2d Cir.1990) ("the non-movant cannot escape summary judgment merely by vaguely asserting the existence of some unspecified disputed material facts, or defeat the motion through mere speculation or conjecture.") (citations and internal quotation marks omitted). Thus, the party resisting summary judgment must come forward with specific facts to show there is a factual question that must be resolved at trial. *Donahue v. Artisan,* 00–8326, 2002 WL 523407, at *1 (S.D.N.Y. April 8, 2002).

## III. DISCUSSION

### A. The Governing Law

#### 1. General Maritime Law

■ At the threshold, I must decide whether the general maritime law governs the parties' conduct, liabilities, rights and obligations. That question depends in turn upon whether the plaintiffs' claims fall within the Court's federal admiralty jurisdiction under 28 U.S.C. § 1333(1), a question that arises even where, as here, a plaintiff asserts diversity of citizenship un-

der § 1332 as the sole basis for subject matter jurisdiction. It is well settled that if a complaint in a tort action invoking diversity jurisdiction pleads a claim within the admiralty jurisdiction of the federal courts, the district court will apply the general maritime law. The Second Circuit made that plain in *Wahlstrom v. Kawasaki Heavy Industries, Ltd.*, 4 F.3d 1084 (2d Cir.1993), a wrongful death case arising out of a collision between two vessels in navigable waters, where plaintiffs sued in diversity and raised only state law claims. The Second Circuit noted that the plaintiffs' tort claim "comes within the admiralty jurisdiction of the federal courts," and added: "With this jurisdiction comes the application of substantive maritime law, and absent a relevant federal statute, we apply the general maritime law as developed by the courts. That law includes elements adopted from the law of products liability." *Id.* at 1087 (citations omitted).

Sometimes this jurisdictional tenet is easier to state than to apply. Justice Holmes once said: "The precise scope of admiralty jurisdiction is not a matter of obvious principle or of very accurate history." *United States v. Evans (The Blackheath)*, 195 U.S. 361, 365, 25 S.Ct. 46, 49 L.Ed. 236 (1904). By now almost everyone knows which contracts are maritime in nature and consequently within the admiralty jurisdiction, although the classifications are enigmatic.[2] Tort cases, with their infinite and kaleidoscopic varieties of wrongful human conduct, can be more difficult to classify. The Supreme Court has sought to give guidance in four relatively recent cases: *Executive Jet Aviation, Inc. v. City of Cleveland*, 409 U.S. 249, 93 S.Ct. 493, 34 L.Ed.2d 454 (1972); *Foremost Insurance Co. v. Richardson*, 457 U.S. 668, 102 S.Ct. 2654, 73 L.Ed.2d 300 (1982);

*Sisson v. Ruby*, 497 U.S. 358, 110 S.Ct. 2892, 111 L.Ed.2d 292 (1990); and *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 115 S.Ct. 1043, 130 L.Ed.2d 1024 (1995).

In *Executive Jet*, a jet aircraft struck a flock of sea gulls on takeoff and sank in the navigable waters of Lake Erie. The Court held that the resulting tort claim for property damage did not fall within admiralty jurisdiction. Rejecting the traditional rule of admiralty jurisdiction which, focusing exclusively on the locus of the harm, held that if the wrong occurred on navigable waters, the action was within admiralty jurisdiction, 409 U.S. at 253, 93 S.Ct. 493 (citing cases), the Court concluded in *Executive Jet* that claims arising from airplane accidents were cognizable in admiralty only if the wrong "bear[s]a significant relationship to traditional maritime activity." *Id.* at 268, 93 S.Ct. 493.

*Foremost Insurance* was a wrongful death action arising out of a collision of two pleasure boats on navigable waters. The Court gave *Executive Jet* an expansive reading, holding that its "requirement that the wrong have a significant connection with traditional maritime activity is not limited to the aviation context." 457 U.S. at 674, 102 S.Ct. 2654. But there is no requirement, *Foremost Insurance* went on to hold, that the maritime activity in question "be an exclusively commercial one." *Id.* (internal quotation marks omitted). Thus a collision between two pleasure boats pursuing no commercial purpose fell within admiralty jurisdiction. The Court reasoned that "[b]ecause the 'wrong' here involves the negligent operation of a vessel on navigable waters, we believe that it has a sufficient nexus to traditional maritime activity to sustain

2. For example, no one has satisfactorily explained why a contract to build a vessel is not maritime in nature, but contracts to repair or

insure her are. *See* Gilmore & Black, *The Law of Admiralty* (2d ed.1975) at 22, 26.

admiralty jurisdiction in the District Court," *id,* supporting that reasoning by the view that the "federal need in protecting maritime commerce" can be fully vindicated "only if *all* operators of vessels on navigable waters are subject to uniform rules of conduct." *Id.* at 675, 102 S.Ct. 2654. In a footnote at 675 n. 5, 102 S.Ct. 2654, the Court acknowledged that "[n]ot every accident in navigable waters that might disrupt maritime commerce will support federal admiralty jurisdiction," giving *Executive Jet* as an example of an accident that did not do so; but this cautionary footnote concludes with the observation that "when this kind of potential hazard to maritime commerce arises out of activity that bears a substantial relationship to traditional maritime activity, as does the navigation of the boats in this case, admiralty jurisdiction is appropriate." The decision was a close one; four justices dissented.

In *Sisson v. Ruby,* 497 U.S. 358, 110 S.Ct. 2892, 111 L.Ed.2d 292 (1990), the Court held that claims arising out of a fire which destroyed a pleasure yacht and damaged a marina and several neighboring boats fell within admiralty jurisdiction. Claimants resisting the yacht owner's petition to limit his liability (a uniquely admiralty remedy) argued that "the potential effect on maritime commerce in this case was minimal because no commercial vessels happened to be docked at the marina where the fire occurred," 497 U.S. at 363, 110 S.Ct. 2892, so that the case was not cognizable in admiralty. The Court rejected that argument:

> This argument misunderstands the nature of our inquiry. We determine the potential impact of a given type of incident by examining its general character. The jurisdictional inquiry does not turn on the *actual* effects on maritime commerce of the fire on Sisson's vessel; nor does it turn on the particular facts of the incident in this case, such as the source

of the fire or the specific location of the yacht at the marina, that may have rendered the fire on the [yacht] more or less likely to disrupt commercial activity. Rather, a court must assess the general features of the type of incident involved to determine whether such an incident is likely to disrupt commercial activity. Here, the general features—a fire on a vessel docked at a marina in navigable waters—plainly satisfy the requirement of potential disruption to commercial maritime activity.

*Id.* As this discussion reveals, in order to sustain admiralty jurisdiction the *Sisson* Court insisted upon some potential effect upon commercial maritime activity, an insistence made manifest at 364 n. 2, where the Court rejected Justice Scalia's argument that "we should abandon the requirement that the incident have the potential for disrupting maritime commerce," and hold that every tort occurring on a vessel in navigable waters should give rise to maritime jurisdiction. Such a rule, the *Sisson* majority stated in the cited footnote, would run counter to *Foremost Insurance,* where "the Court unanimously agreed that the purpose underlying the existence of federal maritime jurisdiction is the federal interest in the protection of maritime commerce, and that a case must implicate that interest to give rise to such jurisdiction."

Not surprisingly, these three cases left some flotsam of jurisdictional uncertainty floating on district court waters. The Court undertook to declare a definitive rule in *Grubart,* where the Court sustained admiralty jurisdiction over a dredging company's petition to limit its liability for the negligent driving of piles into a riverbed, resulting in the flooding of a tunnel under the river. The Court reviewed *Executive Jet, Foremost Insurance,* and *Sisson,* and then said:

After *Sisson,* then, a party seeking to invoke admiralty jurisdiction pursuant to 28 U.S.C. § 1333(1) over a tort claim must satisfy conditions both of location and of connection with maritime activity. A court applying the location test must determine whether the tort occurred on navigable water or whether injury suffered on land was caused by a vessel on navigable water. 46 U.S.C. § 740. The connection test raises two issues. A court, first, must assess the general features of the type of incident involved, to determine whether the incident has a potentially disruptive impact on maritime commerce. Second, a court must determine whether the general character of the activity giving rise to the incident shows a substantial relationship to traditional maritime activity.

513 U.S. at 534, 115 S.Ct. 1043.

In the case at bar, Long Island Sound unquestionably is a navigable waterway, and so the "location test" articulated in *Grubart* is satisfied. The debatable questions arise with respect to the "connection test," and, with all due respect, the Court's statement of the "two issues" inherent in that test does not seem to me to lay all uncertainty at rest. One may ask: to satisfy the "connection test," must both issues be answered in the affirmative, or will one suffice to establish admiralty jurisdiction? And if both factors must be shown, what in practical terms is the difference between them?

■ I believe I discern a subsequent passage in *Grubart* the Court's attempt to answer both the questions I have put. The Court says:

It is worth recalling that the *Sisson tests* are not aimed at the same objectives invoked to support a new multifactor test, the elimination of admiralty jurisdiction where the rationale for the jurisdiction does not support it. If the tort produces no potential threat to maritime

commerce *or* occurs during activity lacking a substantial relationship to traditional maritime activity, *Sisson* assumes that the objectives of admiralty jurisdiction probably do not require its exercise, even if the location test is satisfied. If, however, the *Sisson tests* are also satisfied, it is not apparent why the need for admiralty jurisdiction in aid of maritime commerce somehow becomes less acute merely because land-based parties happen to be involved.

513 U.S. at 544–45, 115 S.Ct. 1043 (emphases added). I have italicized the noun *Sisson* "tests" because the plural suggests that both must be satisfied to sustain admiralty jurisdiction, an interpretation reinforced by the following disjunctive "or." Just what sort of conduct satisfies the apparently two-pronged "connection test" the Court articulated in *Grubart* remains for consideration by district courts on a case-by-case basis, and I may perhaps be excused for saying that the Court's chart does not reveal the precise location of every hazard to jurisdictional navigation.

Turning to the case at bar, it involves a flawed effort to rescue a swimmer from drowning in navigable waters. Plaintiff Stephen Roane did not drown, as he was clearly in peril of doing; but the rescue operations allegedly caused him grievous and injuries, which he ascribes to the negligence of GSC and McDermott and the faulty design of the *Sea Breeze.* Do these claims pass muster under "the *Sisson* tests," so that admiralty jurisdiction is established?

This case does not involve a collision between vessels, thereby implicating the need for uniform rules of navigation. Accordingly, the Supreme Court's finding of admiralty jurisdiction in *Foremost Insurance* and that of the Second Circuit in *Wahlstrom* do not dictate the result here. But the case at bar may, at least with

respect to the efforts of McDermott, the other individuals on the *Sea Breeze,* and the lifeguard on the kayak, fairly be characterized as a case of life salvage; and claims for life salvage (that is to say, claims for services rendered in the saving of lives on navigable waters) traditionally are heard by district courts sitting in admiralty. *See, e.g., Complaint of Ta Chi Nav. (Panama) Corp., S.A.,* 583 F.Supp. 1322 (S.D.N.Y.1984); *Markakis v. S/S Volendam,* 486 F.Supp. 1103 (S.D.N.Y.1980).[3] Moreover, admiralty courts may be called upon to decide whether a salvor has acted so negligently as to become liable for additional damage to the property sought to be salved, applying the generally recognized rule that "the Good Samaritan, once he has entered upon his office, will be treated like anyone else" in respect of tort liability. Gilmore & Black, *The Law of Admiralty* (2d ed.1975) at 556. That is the essence of the present plaintiffs' claims, at least against McDermott and GSC, on whose behalf plaintiffs allege McDermott was acting; and the general character of McDermott's conduct as a life salvor shows a relationship to traditional maritime activity (the saving of lives at sea, for which the salvor must usually settle for a spiritual rather than a material award) sufficiently substantial to satisfy the second of the *Sisson* tests.

I reach the same conclusion with respect to plaintiffs' cause of action against S2, which alleges that Stephen Roane's injuries resulted in part from the fact that the *Sea Breeze* "contained or possessed serious design and/or manufacturing defects likely to cause serious injuries to foreseeable users of the Vessel." Complaint, at ¶ 19. The proper design and manufacture of a vessel intended for use on navigable waters bears a substantial relationship to traditional maritime activity.

It remains to consider the first *Sisson* test, which requires that the incident giving rise to plaintiffs' claims "has a potentially disruptive impact on maritime commerce." [4] There is no uncertainty in that regard with respect to plaintiffs' claim against defendant SR that a contributing cause of Stephen Roane's injuries were design and manufacturing defects in the *Sea Breeze.* The sale of pleasure boats to the public is a significant aspect of "maritime commerce," and if this incident results in an adjudication in plaintiffs' favor against SR, the "disruptive effect" upon that aspect of maritime commerce is not difficult to discern. Moreover, plaintiffs' claim against SR "includes elements adopted from the law of products liability," which the Second Circuit in *Wahlstrom*

---

**3.** Awards for life salvage are infrequently made. Under the governing federal statute, 46 U.S.C. § 729, a life salvage award "can be granted only to those who have foregone the opportunity to engage in the more profitable work of property salvage." *Markakis,* 486 F.Supp. at 1110 n. 28. A leading text accurately states: "If the few life salvage awards which have been made are enough to support a generalization, it can be said that it is still far more profitable to save property than to save lives." Gilmore & Black, *The Law of Admiralty* (2d ed.1975) at 573. In the case at bar, no award for life salvage would lie.

**4.** The fact that the *Sea Breeze* was a pleasure vessel and not a commercial vessel is not dispositive of the issue. On that point the Supreme Court's decision in *Foremost Insurance* controls. The collision was between two pleasure vessels. The Court, concluding that the case came within admiralty jurisdiction, rejected "the strict commercial rule proffered by petitioners" (who resisted admiralty jurisdiction), under which "the status of the boats as 'pleasure' boats, as opposed to 'commercial' boats, would control the existence of admiralty jurisdiction." 457 U.S. at 675, 102 S.Ct. 2654. Similarly, in *Wahlstrom,* 4 F.3d 1084, the Second Circuit held that a collision between two pleasure vessels fell within admiralty jurisdiction, and accordingly applied the general maritime law.

explicitly held were cognizable under the general maritime law. 4 F.3d at 1087.

■ The effect of the conduct of defendants GSC and McDermott upon maritime commerce is less readily apparent. The record on these motions does not reveal whether the Greenwich Point One Mile Swim had any commercial purpose or aspect. It may be nothing more than an annual sporting and social event for residents of an affluent community; or it may benefit some charitable organization; or it may have maritime commercial sponsors who hope to profit from that sponsorship. We simply do not know. And the question must be confronted, because the Supreme Court cautioned in a footnote in *Foremost Insurance,* 457 U.S. at 675 n. 5, 102 S.Ct. 2654, that "[n]ot every accident in navigable waters that might disrupt maritime commerce will support federal admiralty jurisdiction." The only example cited in the footnote which rejected admiralty jurisdiction was *Executive Jet,* where, although "an aircraft sinking in the water could create a hazard for the navigation of commercial vessels in the vicinity," this "potential hazard to maritime commerce" did not arise "out of activity that bears a substantial relationship to traditional maritime activity," *id.* But the text of the *Foremost Insurance* opinion indicates that where (as in the case at bar) a traditional maritime activity is involved, an incident's potential disruption of commercial activity need not be of a high degree to satisfy admiralty jurisdiction. The Court said in *Foremost Insurance,* 457 U.S. at 675, 102 S.Ct. 2654: "For example, if these two boats collided at the mouth of the St. Lawrence Seaway, there would be a substantial effect on maritime commerce, without regard to whether either boat was actively, or had been previously, engaged in commercial activity." Since the mouth of the St. Lawrence Seaway is miles wide and the colliding pleasure boats were small, this example of a potential disrup-

tive effect upon maritime commerce takes the concept about as far as it can go. But it is the Supreme Court's example; and when I consider the tetralogy of Supreme Court cases beginning with *Executive Jet* and ending with *Grubart,* I conclude that the incidents involved in the case at bar, which clearly relate to traditional maritime activity, have a sufficient potentially disruptive impact upon maritime commerce to satisfy the first *Sisson* test of admiralty jurisdiction. Long Island Sound is traversed by commercial vessels of various sizes and purposes, and those on board a boat in the Sound giving their full attention to the saving of the life of a swimmer in difficulty may well be distracted from hazards posed by the approach of other boats unaware of the rescue in progress, or coming at speed in an effort to assist.

For these reasons, I conclude that the case at bar is within the Court's admiralty jurisdiction, and that the general maritime law applies to it.

## 2. State Law Analysis

In *Wahlstrom,* a 1993 decision, the Second Circuit held that "federal maritime law, whether or not it conflicts with state law, applies to actions for wrongful death in state territorial waters brought under the admiralty jurisdiction of the federal courts." 4 F.3d at 1087–88. The validity of that seemingly total displacement of state law in navigable waters death cases must be doubted since the Supreme Court's 1996 decision in *Yamaha Motor Corp., U.S.A. v. Calhoun,* 516 U.S. 199, 116 S.Ct. 619, 133 L.Ed.2d 578 (1996), in which a child was killed in a collision while riding a jet ski in Puerto Rico territorial waters. The Court held that in maritime wrongful-death cases in which no federal statute specifies the appropriate relief and the decedent was not a seaman, longshore worker, or person engaged in maritime

trade, state remedies remain applicable and have not been displaced by the wrongful-death action recognized by the general maritime law in respect of individuals who work on or serve ships. That rationale would appear to apply to the minor child who was killed in the jet ski accident in *Wahlstrom.* But I need not pursue the question further, because (happily) the case at bar is not one for wrongful death.

■ I have previously held in this case that in a maritime case for tortious injury, admiralty courts may refer to state law that neither contravenes a clearly established rule of general maritime law nor impairs a principle of national maritime uniformity. *Roane v. Greenwich Swim Committee,* 01 Civ. 2254, 2004 WL 943572, *1 (S.D.N.Y. Apr.30, 2004).

Two potential sources of supplemental state law exist. Plaintiffs are residents of New York. GSC is a Connecticut corporation. GSC is a Connecticut corporation. McDermott is a Connecticut resident. The incident apparently occurred in the territorial waters of Connecticut. While S2 is a Michigan corporation, the choice of law would seem to lie between New York and Connecticut.

■■ Although for the reasons stated this case falls within the admiralty jurisdiction, it was filed as a diversity action. In diversity cases, a federal court must look to the choice-of-law rules of the state in which it sits to resolve potential conflict of law questions. *Klaxon v. Stentor Electric Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), *AroChem Int., Inc. v. Buirkle,* 968 F.2d 266, 269–70 (2d Cir. 1992). I will use the same approach here. In New York, the first step in any choice of law analysis is to determine whether there is an actual conflict between the laws of the jurisdictions involved. *Matter of Allstate Ins. Co.,* 81 N.Y.2d 219, 223, 597 N.Y.S.2d 904, 613 N.E.2d 936 (N.Y.1993).

After a review of the issues and relevant case law, there does not appear to be a material conflict between the laws of the two states. Notwithstanding GSC most recent submission advocating use of Connecticut state law, since GSC in its original moving papers relied solely on New York law, and since both S2 and Roane expressed no preference as to which state laws should apply, I will adopt New York state law to the extent that state law is not superseded by general maritime law.

## B. Substantive Motions

I now reach the substantive issues of the parties' motions. I will first address defendants' motions to preclude plaintiffs' expert witness and for summary judgment. I will then address GSC's and McDermott's motions for summary judgment and plaintiffs' cross-motion for partial summary judgment.

### 1. S2's Motion to Preclude Expert Witness and for Summary Judgment

#### a) Standard of Review

Defendant S2 moves for an order precluding the testimony of plaintiffs' expert witness pursuant to the Federal Rules of Evidence Rule 702. This rule, which governs the admissibility of scientific, technical, or other specialized expert testimony, provides as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness

has applied the principles and methods reliably to the facts of the case.

■ In *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 597, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the Supreme Court held that this rule assigns to District Courts a gatekeeping task of ensuring that expert opinion testimony both rests on a reliable foundation and is relevant to the task at hand. In fulfilling this role, I must determine whether the proffered testimony has a sufficiently reliable foundation to permit it to be considered. *Id.* That is, I must make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field. *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).

In *Daubert* the Court identified four factors that a District Court may consider in a Rule 702 analysis. They are:

(1) whether a theory or technique can be and has been tested;

(2) whether it has been subjected to peer review and publication;

(3) whether it has a high known or potential rate of error; and

(4) whether it is generally accepted in the relevant scientific community.

*Daubert,* 509 U.S. at 592–94, 113 S.Ct. 2786.

The *Daubert* factors are neither mandatory nor exclusive. In *Kumho Tire,* the Supreme Court emphasized that the test for reliability is a flexible one, since *"Daubert's* list of specific factors neither necessarily nor exclusively applies to all experts or in every case." 526 U.S. at 141, 119 S.Ct. 1167. District Courts consider the *Daubert* factors "where they are reasonable measures of the reliability of expert testimony." *Id.* at 152, 119 S.Ct. 1167. "The trial court must have the same kind of latitude in deciding *how* to test an expert's reliability, and to decide whether or when special briefing or other proceedings are necessary to investigate reliability, as it enjoys *whether* that expert's relevant testimony is reliable." *Id.*

■ In undertaking this inquiry, a District Court must focus on the principles and methodology employed by the expert, without regard to the conclusions reached, or the Court's belief as to the correctness of those conclusions. *Daubert,* 509 U.S. at 595, 113 S.Ct. 2786. But as the Second Circuit has noted in its interpretation of *Daubert* and *Kumho Tire,* when an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony. *Amorgianos v. National Railroad Passenger Corp.,* 303 F.3d 256, 266 (2d Cir.2002).

■ "The flexible *Daubert* inquiry gives the district court the direction needed to ensure that the courtroom door remains closed to junk science while admitting reliable expert testimony that will assist the trier of fact. *Amorgianos,* 303 F.3d at 267. Minor flaws in an expert analysis or slight modifications of otherwise reliable methods will not render an expert opinion *per se* inadmissible. *Id.* This accords with the liberal admissibility standards of the federal rules and recognizes that our adversary system provides the necessary tools for challenging reliable, albeit debatable, expert testimony. *Id.* Notably, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence". *Daubert,* 509 U.S. at 596, 113 S.Ct. 2786.

Finally, if admissible evidence is insufficient to permit a rational juror to find in

favor of the plaintiff, I may grant summary judgment in favor of the defendant. *Amorgianos*, 303 F.3d at 267. However, should I deem the evidence sufficiently reliable to be admissible, I am bound to consider the evidence in the light most favorable to plaintiff when deciding a motion for summary judgment. *Id.* at 268 (citations omitted).

### b) Application

Plaintiff expert witness van Hemmen cites five contributing factors causing Roane injury. They are as follows:

1. The design of the vessel.
2. The operation of the vessel.
3. Safety procedures during the event.
4. The selection and applicability of the safety equipment used.
5. The number and deployment of life guards during the event.

The focus of this section of the opinion will be on van Hemmen's first cited contributing factor, the design of the vessel. As set out in his report and accompanying affidavit, along with relevant depositions, van Hemmen concludes that the design of the vessel's swim platform and ladder places swimmers in Roane's position dangerously close to the sharp surfaces of the vessel engine outdrives, particularly when those outdrives are in the trimmed up position. Van Hemmen suggests two design alternatives that would place swimmers at less risk of harm: either extending the swim platform further aft, or moving the swim ladder to one side of the platform, further away from the outdrives. Finally, van Hemmen is also prepared to testify that S2 failed to provide any warnings in its vessel documentation, including the owner's manual, of the danger to swimmers in the vicinity of the swim platform posed by the nearness of the ladder and platform edge to the outdrives, particularly when the outdrives are in a trimmed up position. *See*

van Hemmen Aff., 8, and van Hemmen Report at 6–7.

These are the conclusions that van Hemmen have reached, and is prepared to testify to in trial. However, the thrust of my analysis must be not with van Hemmen's conclusions but rather his methodology employed in reaching those conclusions. In his affidavit, van Hemmen outlines the specific methodology he used to formulate his opinion. It consisted of the following:

1. Inspection and review of photographs of the vessel that Roane was attempting to board when he suffered his injuries.
2. Review of medical records documenting Roane's injuries and treatment.
3. Review of all deposition testimony taken in the case.
4. Comparison of this information, as embodied in the above mentioned documentation and testimony, with photographic evidence of the vessel.
5. Reliance on his experience and training as a professional engineer, designer, naval architect and risk assessment consultant.

S2 argues that van Hemmen's testimony should be excluded because he conducted no tests prior to formulating his opinions, he never actually physically observed the *Sea Breeze* or its swim platform, his theories have not been subject to peer review or publication, his theories contain no measurements and therefore cannot be measured against a known or potential rate of error, and he has failed to demonstrate that there has been a general acceptance of his theories. S2 also asserts that van Hemmen failed to test his alternative designs, and has not offered any evidence of boats designed in the manner in which he proposes. Finally, S2 contends that the proximate cause of Roane's injury was a combination of operator error and dangerous ocean conditions, and that there is no

support for van Hemmen's theory that a defective design of the vessel was a contributing factor.

 Ultimately, van Hemmen's opinion regarding the S2 vessel design defects is based upon his review of photographs of the vessel, as well as medical reports, depositions, and his own experience as a professional. I do not question van Hemmen qualifications as a professional engineer, designer, naval architect, or risk assessment consultant. However, van Hemmen methodology does not seem to rise to the level of intellectual rigor mandated by Rule 702.

The methodology used by van Hemmen in his analysis has failed to meet any of the four factors noted in *Daubert*. Van Hemmen has not tested his own design or subjected his alternate design theories to peer review. His design has no known rate of error, since it has not been tested, and van Hemmen has not shown general acceptance of his design or methodology.

Of course, these are not the only factors to be considered by the Court in a Rule 702 analysis. But where van Hemmen's report is lacking in these respects, neither he nor the plaintiffs buttress the analysis with other, supplemental factors.

Van Hemmen's conclusions with respect to alternate designs are particularly lacking. In his expert report, van Hemmen merely suggests, in his own qualified opinion, that S2 design defects would have been reduced by means of warnings to operators, extending the stern platform further aft, or repositioning the swim ladder to the side of the vessel. Van Hemmen Report at 6. These alternatives are not accompanied by any drawings or models, nor does he submit any examples of other boats that have adopted such de-signs. Rather, in his affidavit van Hemmen concedes that extending the length of the swim platform would not be commercially attractive to S2. Van Hemmen has never attempted to reconstruct the accident for himself, nor has he tested his own theories of design safety.

In *Zaremba v. General Motors Corp.*, 360 F.3d 355 (2d Cir.2004), the Second Circuit upheld a District Court decision to exclude the testimony of plaintiffs' experts under circumstances similar to this one. As in this case, plaintiffs' experts had not examined or tested the vehicle in question, nor had they included measurements, calculations, drawings or models supporting their theories, conducted any tests, or offered calculations in support of their alternate designs. However, even in that case, one of plaintiffs' experts, while not performing any tests on his alternative designs himself, relied on tests that defendant had conducted on a vehicle similar to those that the expert had suggested as alternatives. In this case, van Hemmen relies neither on his own tests or those conducted by defendant. *Zaremba* applies *a fortiori.*

Plaintiffs' reliance on *Groobert v. President and Directors of Georgetown College*, 219 F.Supp.2d 1(D.D.C.2002), a decision not binding upon me in any event, is misplaced. The court noted in that case that the methodologies adopted by plaintiff s' expert, which consisted of comparative analysis and experience-based studies, were generally accepted in the industry. *Id.* at 8. Plaintiffs have made no such showing here. And while some courts may find that a particular practice is commonly accepted merely because it is practiced by both plaintiff's and defendant's experts, *see id.,* I am not compelled to adopt this conclusion in this particular case.[5]

---

5. Note that should I find that defendant S2's expert testimony is inadmissible for the same reasons as plaintiff's expert, this would still leave plaintiff without a *prima facie* case of design defect.

Based on a review of his affirmation and expert report, I find that van Hemmen's testimony with respect to the design and manufacturing of the S2 vessel would be insufficiently reliable to fall within the guidelines of Fed.R.Evid. 702. I exclude van Hemmen's testimony only to the extent he discusses design and manufacturing defects of the vessel. Having excluded van Hemmen's testimony, plaintiffs cannot make out a *prima facie* case of a design defect. Therefore, pursuant to Fed. R.Civ.P. Rule 56, I will grant summary judgment in favor of S2.

## 2. GSC's and McDermott's Motion to Exclude Plaintiff's Expert Pursuant to Rule 702

GSC and McDermott have filed their own motions to exclude the opinion testimony of expert witness van Hemmen. As to these defendants, van Hemmen's opinions do not deal with perceived design defects, as in the case with defendant S2. Rather, van Hemmen's testimony with respect to GSC and McDermott focus principally upon the issue of whether these defendants acted negligently with relation to Stephen Roane's participation in the swim event.

However, I will not consider this motion at this time as it was untimely filed. In a letter from S2's counselor of record, Joseph A. Fitapelli, Esq., dated December 22, 2003, agreed to by all parties, and endorsed by Magistrate Judge James F. Francis, the parties had agreed upon February 5, 2004 as the deadline by which defendants must file and serve all motions.

Contrary to the assertion of Michael J. Pearsall, Esq., in a letter to the Court dated March 11, 2004, wherein he submits that a "motion seeking to preclude plaintiff's expert was filed by co-defendant S2 Yachts, Inc., on or about February 26, 2004," the record clearly indicates that defendant S2's motion to preclude plaintiff's witness was filed on February 5, 2004. This was, of course, the final date upon which the parties had agreed that defendants could submit motions. The record also indicates that GSC's and McDermott's motion to preclude plaintiff's witness was not filed until February 23, 2004. It is also clear from the motion papers that Pearsall had not signed and dated the motion until February 13, 2004.

Therefore, GSC's and McDermott's Motion is denied, without prejudice, as untimely filed. Any motion to preclude the remaining portions of van Hemmen's testimony should be raised at the time of the trial. Such motions, if made, will depend *inter alia* upon whether van Hemmen's opinions are admissible under Rule 702 or whether they impermissibly usurp the function of the fact finders.

## 3. GSC's and McDermott's Motion for Summary Judgment and Plaintiffs' Cross–Motion for Partial Summary Judgment

GSC's and McDermott's motion for summary judgment comprises three arguments. First, they attest that Roane released them from all liability when he executed a waiver form prior to the race. Second, they argue that Roane assumed the risk of injury during the one mile swim and had full knowledge of the dangers inherent in such an event. Third, they allege that none of their own actions arise to the level of negligence.

Plaintiffs cross-move for partial summary judgment, to strike GSC's and McDermott's Second Affirmative Defense, stating that Roane assumed the risk of injury, and their Seventh Affirmative Defense, asserting that Roane released them from liability of this instant claim.

### a) Waiver Form

Prior to the race, Roane signed a written swim entry and waiver form, which contained the following language:

> In consideration of acceptance of this entry, I, the undersigned intending to be legally bound, do hereby, from myself, my heirs, executives and administrative, waive and release any and all rights and claims for damages I may have against any and all race sponsors, or the cities and towns in which the race is contested, their representatives, successors and assigns, for any and all injuries suffered by me in said event. I attest and verify that I am physically fit and sufficiently trained for the completion of this event and my physical condition has been verified by a licensed Medical Doctor within the last six months. Further, I hereby grant permission to any and all of the foregoing to use any photographs, videotapes, motion pictures, recordings or any other record of this event for any purpose whatever without compensation or remuneration.

GSC and McDermott argue that the language of the form clearly and unequivocally releases them from liability for all injuries that Roane may have suffered in the event.

It is a well settled proposition that if courts in this state generally enforce exculpatory provisions in a contract purporting to insulate a party from liability resulting from his own negligence, they do so only begrudgingly. Such provisions, disfavored by the law, are closely scrutinized and held to exacting standards. In order to be enforced, the language of the exculpation must express "in unequivocal terms the intention of the parties to relieve a defendant of liability for the defendant's negligence." *Lago v. Krollage,* 78 N.Y.2d 95, 100, 571 N.Y.S.2d 689, 575 N.E.2d 107 (1991).

Though the actual word "negligence" need not need not always appear in a liability waiver form to render the form effective, *see Gross v. Sweet,* 49 N.Y.2d 102, 424 N.Y.S.2d 365, 400 N.E.2d 306, (1979), its presence is certainly significant. In prior cases where defendants have included the word "negligence" in their waiver forms, courts have often found that plaintiffs had released those defendants from liability. See, for instance, language in the waiver forms of the following cases, in which courts have held in favor of defendants: *Scrivener v. Sky's the Limit, Inc.,* 68 F.Supp.2d 277, 278 (S.D.N.Y.1999) ("Participant expressly assumes all risk of injury and releases the Released Parties from any and all liabilities ... cased by the **PASSIVE OR ACTIVE NEGLIGENCE** of Released Parties.") (emphasis in original); *Lux v. Cox,* 32 F.Supp.2d 92, 96 (W.D.N.Y.1998) ("THE UNDERSIGNED ... HEREBY RELEASES ... 'Releasees,' FROM ALL LIABILITY ... WHETHER CAUSED BY THE NEGLIGENCE OF THE RELEASEES OR OTHERWISE.") (emphasis in original); *Lago,* 78 N.Y.2d at 99, 571 N.Y.S.2d 689, 575 N.E.2d 107 ("The document further provided that each person signing it: agreed to 'release' [defendants] ... from all liability claims ... from any cause whatsoever including negligence of any of the foregoing."). *See also Baschuk v. Diver's Way Scuba, Inc.,* 209 A.D.2d 369, 370, 618 N.Y.S.2d 428 (2d Dep't 1994) ("Because of its clarity, precision, and specificity in absolving the defendant from the consequences of all negligence, the liability release is enforceable.").

If the word "negligence" is absent from a waiver, other words of "similar import" must be in effect. For instance, in *Theroux v. Kedenburg Racing Assn.,* 50 Misc.2d 97, 99, 269 N.Y.S.2d 789 (1965), *cited in Gross,* 49 N.Y.2d at 108, 424 N.Y.S.2d 365, 400 N.E.2d 306, plaintiff was

held to have released defendants from liability when he signed a waiver form that disclaimed liability "even if the loss is caused by the neglect or fault of . . . any of the parties mentioned herein as being released."

■ On the other hand, when language conveying to the signatory that the defendant is not liable for his own negligence is *not* expressed in unmistakable language, an exculpatory clause will not insulate a party from liability for his own negligent actions. *See e.g., Commercial Union Ins. Co. v. Blue Water Yacht Club Ass'n,* 239 F.Supp.2d 316, 320–21 (E.D.N.Y.2003) ("The instant agreement contains no language that conveys a similar meaning to disclaim negligence without using that word, such as that Blue Water is not responsible for damages caused by its own fault or when it fails to use reasonable care."); *Gross,* 49 N.Y.2d at 109, 424 N.Y.S.2d 365, 400 N.E.2d 306 ("Assuming that this language alerted the plaintiff to the dangers inherent in parachute jumping and that he entered into the sport with apprehension of the risks, it does not follow that he was aware of, much less intended to accept, any *enhanced* exposure to injury occasioned by the carelessness of the very persons on which he depended for his safety.").

The disclaimer form signed by Roane does not state unequivocally that GSC, McDermott, or any other defendant is relieved of its own negligence, either through use of that word or another phrase of similar import. There is no indication that participants are aware of or intend to accept any enhanced exposure to injury arising from negligence of the defendants. Rather, the pertinent language of the form—that the participant would "waive and release any and all rights and claims for damages I may have against any and all race sponsors . . . for any and all injuries suffered by me in said event"—is

strikingly familiar to other waiver forms that have not been found exculpatory in prior cases. See, for instance, the language in *Gross,* 49 N.Y.2d at 109, 424 N.Y.S.2d 365, 400 N.E.2d 306 ("I, the undersigned . . . do waive any and all claims that I . . . may have against [defendants] for any personal injuries . . . that I may sustain or which may arise out of my learning, practicing or actually jumping from an aircraft."). *See also Kaufman v. American Youth Hostels,* 5 N.Y.2d 1016, 1017, 185 N.Y.S.2d 268, 158 N.E.2d 128 (1959) (purportedly releasing defendants of "all responsibility or liability of any nature whatsoever for any loss of property or personal injury occurring on this trip or any substitute trip under its management"); *Hertzog v. Harrison Island Shores, Inc.,* 21 A.D.2d 859, 859, 251 N.Y.S.2d 164 (1964) (purportedly waiving "claim for any loss to personal property, or for any personal injury while a member of said club").

■ GSC's and McDermott's failure to state in plain and precise terms that the limits of liability extend to their own negligence renders the purported disclaimer unenforceable with regard to plaintiffs' claims against them. I therefore grant plaintiffs' motion to strike GSC's and McDermott's Seventh Affirmative Defense, which had alleged that Roane has executed a general release of the instant claim.

### b) Assumption of Risk

■ GSC and McDermott next argue that Roane assumed the risk of loss, injury or damage when he participated in the one-mile swim. However, assumption of risk is not a valid defense available to the defendants in admiralty law. *United States v. Reliable Transfer Co.,* 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975) (prohibiting use of assumption of risk defense in an admiralty collision case); *Great*

*Am. Ins. v. Tugs "Cissi Reinauer",* 933 F.Supp. 1205, 1217 n. 6 (S.D.N.Y.1996) ("It is well-established that assumption of risk is not a defense in admiralty law."). Since I have held that federal general maritime law is applicable in this case, I also grant plaintiffs' cross motion to strike GSC's and McDermott's assumption of risk defense.

### c) Actions Rising to the Level of Negligence

 Finally, I reject GSC's and McDermott's argument that none of their actions rise to the level of negligence. The party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists for trial, and that the undisputed facts establish the right of the moving party to judgment as a matter of law. Here, the record contains evidence that, interpreted in a light favorable to the non-moving party, could establish the negligence of GSC and McDermott.

There is evidence that GSC did not have a sufficient amount of lifeguards to ensure the safety of all participants. The record might also reveal that McDermott's *Sea Breeze* was not a proper rescue and assist vessel for the kind of event sponsored. Likewise, there is evidence that may show that GSC personnel misdirected Roane once he was taken near the vessel.

There is evidence that may implicate McDermott for negligence as well. For instance, McDermott may have been negligent in operating his vessel despite the failure of the port side sterndrive. He may have also been negligent in his attempts to assist Roane onto his boat, either in failing to direct him to the swim ladder or keeping the starboard engine in neutral while Roane was attempting to board.

Collectively, the evidence is sufficient to establish that material facts exist which survive a motion for summary judgment.

Therefore, I deny GSC's and McDermott's motion for summary judgment.

## IV. CONCLUSION

For the foregoing reasons:

1. Defendant S2's motion to preclude plaintiffs' expert witness is granted. Having excluded plaintiffs' expert witness, plaintiffs cannot make a *prima facie* case against S2. Therefore, S2's motion for summary judgment is granted.

2. GSC's and McDermott's motion for summary judgment is denied. Plaintiffs' cross motion for partial summary judgment striking GSC's and McDermott's Second and Seventh Affirmative Defenses is granted.

3. GSC's and McDermott's motion to preclude plaintiffs expert witness is denied as untimely, without prejudice to these defendants' right to challenge the admissibility of the witness's testimony against them *in limine* prior to trial.

4. A further scheduling order will enter. The parties may anticipate a trial date in October 2004

It is SO ORDERED.