15-665
In Re Petition of Bruce Germain

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

_____

August Term, 2015

(Argued: February 29, 2016          Decided: June 1, 2016)

Docket No. 15-665
_____

IN RE PETITION OF BRUCE GERMAIN

_____

BRUCE GERMAIN,

*Petitioner-Appellant,*

MATTHEW F. FICARRA,

*Claimant-Appellee.*[*]
_____

B e f o r e:

KATZMANN, *Chief Judge*, SACK and LOHIER, *Circuit Judges*.
_____

Appeal from the dismissal of a petition for exoneration from or limitation of liability under the Limitation of Liability Act of 1851, 46 U.S.C. §§ 30501–12, for lack of subject matter jurisdiction. Applying the Supreme Court's multi-part test for admiralty tort jurisdiction, the United States District Court for the Northern District of New York (Sannes, *J.*) dismissed Petitioner-Appellant Bruce Germain's petition for lack of jurisdiction, holding that a recreational injury occurring on a recreational vessel anchored in a shallow recreational bay of navigable waters could not disrupt maritime commerce and did not bear a sufficient relationship to traditional maritime activity. Although we believe the district court correctly articulated the Supreme Court's modern test for admiralty tort jurisdiction, we respectfully disagree with its conclusion that jurisdiction is lacking here. Accordingly, we REVERSE and REMAND for further proceedings.

———————————

JAMES E. MERCANTE, Rubin Fiorella & Friedman LLP, New York, NY, *for Petitioner-Appellant*.

JAN S. KUBLICK, McMahan, Kublick & Smith, PC, Syracuse, NY, *for Claimant-Appellee*.

———————————

KATZMANN, *Chief Judge*:

In broad strokes, this case concerns a tort involving a vessel on navigable waters. More specifically, the case involves a diving accident off a recreational vessel anchored in shallow but navigable lake waters. Before the 1970s, it would have been beyond doubt that such facts would place this case squarely in the jurisdiction of the federal courts, because the traditional test for admiralty tort

---

* The Clerk of Court is respectfully directed to amend the caption as indicated above.

2

jurisdiction simply asked whether the tort occurred on navigable waters.

But in 1972, the Supreme Court began refining the situs rule, or locality test, for admiralty tort jurisdiction to weed out "absurd" cases that had little to do with maritime commerce, such as planes crashing into lakes or swimmers colliding into each other. In three subsequent cases, the Court further developed this test, creating a multi-part inquiry designed to address cases at the margin of admiralty jurisdiction. In addition to location, the prevailing test now focuses on whether the incident giving rise to the tort, defined at an "intermediate level of possible generality," has a "potentially disruptive effect on maritime commerce, and whether the general character of the activity giving rise to the incident bears a substantial relationship to traditional maritime activity." *Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 247–48 (2d Cir. 2014).

Applying this test, the United States District Court for the Northern District of New York (Sannes, *J.*) held that admiralty jurisdiction was lacking here. The district court reasoned that a recreational injury occurring on a recreational vessel anchored in a shallow recreational bay of navigable waters could not disrupt maritime commerce and did not bear a sufficient relationship to traditional

3

maritime activity. Although we believe the district court correctly articulated the Supreme Court's modern test for admiralty tort jurisdiction, we respectfully disagree with its conclusion that jurisdiction is lacking here. Indeed, the Supreme Court has instructed us that, "ordinarily," "every tort involving a vessel on navigable waters falls within the scope of admiralty jurisdiction." *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 543 (1995). Accordingly, we REVERSE and REMAND for further proceedings consistent with this opinion.

**Standard of Review**

"When reviewing a district court's determination of subject matter jurisdiction pursuant to Rule 12(b)(1), we review factual findings for clear error and legal conclusions *de novo*." *Tandon*, 752 F.3d at 243 (brackets omitted) (quoting *Close v. New York*, 125 F.3d 31, 35 (2d Cir. 1997)). "It is . . . well established that when the question is subject matter jurisdiction, the court is permitted to rely on information beyond the face of the complaint." *St. Paul Fire & Marine Ins. Co. v. Universal Builders Supply*, 409 F.3d 73, 80 (2d Cir. 2005); *see also Kamen v. Am. Tel. & Tel. Co.*, 791 F.2d 1006, 1011 (2d Cir. 1986) ("[W]hen, as here, subject matter

4

jurisdiction is challenged under Rule 12(b)(1), evidentiary matter may be presented by affidavit or otherwise.").[1]

## Factual Background

The district court found that, on July 30, 2011, Petitioner-Appellant Bruce Germain, Claimant-Appellee Matthew Ficarra, and three others left Brewerton, New York, on the shore of Lake Oneida, for an excursion on Germain's 38-foot motor boat, *Game Day. See Ficarra v. Germain*, 91 F. Supp. 3d 309, 312 (N.D.N.Y. 2015). Lake Oneida is connected to and part of the New York State Erie Canal System. *Id.* Using a federal shipping lane, the five headed to the shallow Three Mile Bay, a popular spot for recreational swimming on Lake Oneida that is less than a nautical mile from the federal shipping lane. *Id.* When Germain, Ficarra, and the three other guests anchored at around 12:30 p.m., the bay was already crowded with other boats. *Id.*

---

[1] As discussed in the procedural history section, the present appeal concerns one of two separate but related actions that the district court collectively addressed in a single memorandum-decision and order. Because of the semi-consolidated nature of the two actions and their overlapping issues, the district court relied on "uncontroverted facts in the complaints in each case," i.e., the negligence complaint and the limitation petition (which in turn referenced the negligence complaint), and it also considered the facts presented in the parties' affidavits that were filed in both actions. *See Ficarra v. Germain*, 91 F. Supp. 3d 309, 312 n.2 (N.D.N.Y. 2015).

Around 6:00 p.m., Germain began preparing for the return trip to Brewerton, and Ficarra and the other passengers[2] began returning to the boat. *Id.* At some point while Germain and the other passengers were preparing the vessel for the return trip, Ficarra dived[3] off the port side into the water. *Id.* Ficarra climbed back on board and entered the water again, this time doing a back flip from the back of the boat that resulted in his striking his head on the lake floor. *Id.* at 312–13. Germain and others then jumped into the water to assist Ficarra. *Id.* Local rescue and police boats later arrived at the scene, and they took Ficarra back across Lake Oneida to Brewerton via the federal shipping lane.[4] *Id.* at 313. Doctors

---

[2] As in *Tandon*, "[w]e use the term 'passenger' throughout in its broad general sense of 'a person who travels in a conveyance . . . without participating in its operation,'" 752 F.3d at 241 n.2 (quoting *passenger, n.*, The American Heritage Dictionary 1285 (4th ed. 2000)), rather than its more technical sense under admiralty and maritime law, *see, e.g.*, 1 Thomas J. Schoenbaum, *Admiralty and Maritime Law* § 5-5 at 269–70 (5th ed. 2011).

[3] "Although *dove* is fairly common in [American English] (on the analogy of drove), *dived* is the predominant past-tense form—and the preferable one." Bryan A. Garner, *Garner's Modern American Usage* 269 (3d ed. 2009).

[4] At oral argument, Ficarra's attorney disputed whether Ficarra had been taken back to Brewerton by boat, but he candidly admitted that he could not provide a record citation for his view of events. We rely on the facts found by the district court, which are not clearly erroneous. In any event, whether Ficarra was actually taken back to Brewerton by boat or other means does not affect our analysis.

later determined that Ficarra suffered a serious spinal cord injury causing paralysis and quadriplegia. *Id.*

**Procedural History**

On June 16, 2014, Ficarra filed suit against Germain in New York State Supreme Court, asserting claims for negligence under New York law. Ficarra's complaint alleges, among other things, that Germain was negligent for failing: (1) to operate, captain, anchor, maintain, or control his vessel in a safe and reasonably prudent manner to protect the safety and welfare of his boat's passengers; (2) to properly and adequately instruct his passengers on safe boating and diving practices; (3) to properly and adequately inspect the area in which his boat was anchored; and (4) to adequately warn his passengers of the dangerous conditions existing at the time of the aforementioned incident.

On July 17, 2014, Germain removed Ficarra's negligence suit to the United States District Court for the Northern District of New York. On August 18, 2014, Ficarra moved to remand the action back to state court for lack of subject matter jurisdiction, arguing that the claims alleged in his complaint were not within the scope of admiralty jurisdiction.

7

On August 14, 2014, Germain filed a petition in the United States District Court for the Northern District of New York seeking exoneration from or limitation of liability under the Limitation of Liability Act of 1851, 46 U.S.C. §§ 30501–12, and Rule F of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions ("Rule F").[5] On August 20, 2014, the district court (Kahn, *J.*) issued an order in the limitation proceeding directing Germain "to submit a brief explaining why his [petition] should not be dismissed for lack of subject matter jurisdiction." App. 38. As ordered, Germain filed a brief, affidavit, and related exhibits in support of his limitation petition, and he also filed these same papers in opposition to Ficarra's motion to remand in the separate negligence action.

Both the negligence action and limitation proceeding were then transferred to a different judge on December 29, 2014. In a single memorandum-decision and order, the district court (Sannes, *J.*) concluded that Ficarra's claims did not meet the modern test for admiralty tort jurisdiction. *See Ficarra*, 91 F. Supp. 3d at 313–

---

[5] As in *Tandon*, "we adhere to the more common practice of using the terms 'petition' and 'petitioner'" under the Limitation of Liability Act rather than "complaint" and "plaintiff." 752 F.3d at 240 n. 1 (citing 3 *Benedict on Admiralty* § 1 (7th ed. rev. 2009)).

17.[6] And because the district court held that it lacked jurisdiction to hear either action, it remanded the negligence suit and dismissed the limitation petition. *Id.* at 318.

Germain filed notices of appeal in both actions, but he voluntarily withdrew the notice of appeal in the remanded negligence suit, recognizing that, under 28 U.S.C. § 1447(d), "[a]n order remanding a case to the State court from which it was removed is not reviewable on appeal or otherwise," unless the case was removed pursuant to 28 U.S.C. §§ 1442 or 1443. Accordingly, the only appeal presently before us is the district court's dismissal of Germain's limitation petition.

**Discussion**

The key issue on appeal is whether federal courts have admiralty jurisdiction over claims for injury to a passenger who jumped from a vessel on open navigable waters. They do. But before we reach this question, we must first

---

[6] The district court also rejected Germain's untimely argument for diversity jurisdiction, *see Ficarra*, 91 F. Supp. 3d. at 317–18, a rejection that Germain does not challenge on appeal.

address Ficarra's primary argument that the present appeal is an improper attack on the district court's remand order. It is not.

## I.

Ficarra's primary argument in opposition to Germain's appeal is that Germain's appeal of the limitation petition's dismissal is an improper attack on the district court's remand order, which Germain did not—indeed, could not—appeal. In short, and as discussed in greater detail below, because admiralty cases involving petitions for limitation of liability may proceed on dual tracks in state and federal court, Germain is entitled to appeal the dismissal of his limitation petition.

The Constitution provides that "[t]he judicial Power shall extend . . . to all Cases of admiralty and maritime Jurisdiction." U.S. Const. art. III, § 2. Congress codified this constitutional grant of admiralty and maritime jurisdiction in 28 U.S.C. § 1333(1), which provides that "[t]he district courts shall have original jurisdiction, exclusive of the courts of the States, of . . . [a]ny civil case of admiralty or maritime jurisdiction, saving to suitors in all cases all other remedies to which they are otherwise entitled." The interaction between the exclusivity

10

clause and the saving-to-suitors clause of § 1333(1) has caused much confusion. *See, e.g., Lewis v. Lewis & Clark Marine, Inc.*, 531 U.S. 438, 444 (2001) ("What the drafters of the Judiciary Act intended in creating the saving to suitors clause is not entirely clear and has been the subject of some debate.").

Adding to the confusion is a separate statute, the Limitation of Liability Act of 1851, 46 U.S.C. §§ 30505–12, which Congress enacted "to encourage ship-building and to induce capitalists to invest money in this branch of industry." *Tandon*, 752 F.3d at 243–44 (quoting *Lewis*, 531 U.S. at 446). As we explained in *Tandon*, "[u]nder the present version of this statute, 'the liability of the owner of a vessel for any claim, debt, or liability [covered by the Act] shall not exceed the value of the vessel and pending freight." *Id.* at 244 (quoting 46 U.S.C. § 30505(a)).

More specifically, the Limitation of Liability Act creates "a form of action peculiar to the admiralty and maritime context," allowing the owner of a vessel to file a petition in federal court seeking total exoneration from or limitation of liability for "damages caused by the negligence of his captain or crew." *Id.* at 243–44; *see also* 46 U.S.C. § 30511(a); Rule F. Typically, "[o]nce the owner files a petition for limitation, 'all [other] claims and proceedings against the owner related to the

11

matter in question shall cease.'" *Tandon*, 752 F.3d at 244 (quoting 46 U.S.C.

§ 30511(c)). Notice is then sent to all persons asserting claims affected by the

limitation proceeding, who may file claims and challenge the petitioner's right to

limitation or exoneration. *See id.* "If the petition for limitation of liability is

granted, the owner can be liable on the covered claims only up to the total value

of his vessel and its pending freight; that amount will then be distributed pro rata

among the proven claims." *Id.*

As this brief discussion reveals, "[s]ome tension exists between the saving

to suitors clause and the Limitation Act. One statute gives suitors the right to a

choice of remedies, and the other statute gives vessel owners the right to seek

limitation of liability in federal court." *Lewis*, 531 U.S. at 448. To resolve this

tension, "the Courts of Appeals have generally permitted claimants to proceed

with their claims in state court where there is only a single claimant . . . or where

the total claims do not exceed the value of the limitation fund." *Id.* at 451. In *Lewis*,

the Supreme Court endorsed this practice, and it further clarified that

> [t]he district courts have jurisdiction over actions arising under the
> Limitation Act, and they have discretion to stay or dismiss
> Limitation Act proceedings to allow a suitor to pursue his claims in
> state court. If the district court concludes that the vessel owner's

12

right to limitation will not be adequately protected—where for example a group of claimants cannot agree on appropriate stipulations or there is uncertainty concerning the adequacy of the fund or the number of claims—the court may proceed to adjudicate the merits, deciding the issues of liability and limitation. But where . . . the District Court satisfies itself that a vessel owner's right to seek limitation will be protected, the decision to dissolve the injunction [staying the state court proceeding] is well within the court's discretion.

*Id.* at 454 (citations omitted). "In sum, [the] Court's case law makes clear that state courts, with all of their remedies, may adjudicate claims . . . against vessel owners so long as the vessel owner's right to seek limitation of liability is protected." *Id.* at 455; *see also* 3 *Benedict on Admiralty* § 13 (7th ed. rev. 2015); 2 Thomas J. Schoenbaum, *Admiralty and Maritime Law* § 15-5 (5th ed. 2011); 13 Charles A. Wright *et al.*, *Federal Practice and Procedure* § 3527 (3d ed. 2008).

Because cases that involve limitation petitions may proceed on dual tracks in state and federal court, there is nothing impermissible about Germain's present appeal. The district court concluded that admiralty jurisdiction was lacking for either proceeding, a conclusion that necessitated remanding Ficarra's negligence suit and dismissing Germain's limitation petition. But since the district court may still be able to adjudicate his limitation petition if admiralty jurisdiction is present, Germain's appeal of the limitation petition's dismissal is proper, even if that

13

appeal presses the existence of subject matter jurisdiction, contrary to the premise of the district court's remand order that jurisdiction was absent.

## II.

Having addressed the propriety of the present appeal, we must now decide whether the appeal has any merit. As a threshold matter, "[a]lthough the Limitation of Liability Act provides a federal cause of action for a vessel owner seeking exoneration or limitation, it 'does not provide an independent foundation for federal admiralty jurisdiction.'" *Tandon*, 752 F.3d at 244 (quoting *MLC Fishing, Inc. v. Velez*, 667 F.3d 140, 143 (2d Cir. 2011) (per curiam)). In other words,

> that a vessel owner may file a petition for limitation does not mean the district court necessarily has jurisdiction to hear it. Instead, the district court will only have admiralty jurisdiction to hear a petition for limitation if it already has admiralty jurisdiction over the underlying claims that the petition seeks to limit.

*Id.* As in *Tandon*, our present task is therefore limited to determining "whether the underlying claims raise a 'civil case of admiralty or maritime jurisdiction' that the district court could hear under 28 U.S.C. § 1333(1)." *Id.*

In answering this question, we first discuss the history of the modern test for admiralty tort jurisdiction, placing that test in the context of the problem it was designed to address. We then apply that test to the facts of this case, bearing

14

in mind this jurisprudential history. Although we disagree with the district court's application of the modern test, the test is far from a model of clarity and it is more than understandable how the district court, in its thoughtful opinion, could have gone off course.

**A.**

Traditionally, admiralty jurisdiction "over tort actions was determined largely by the application of a 'locality' test." *Sisson v. Ruby*, 497 U.S. 358, 360 (1990). That is, "[t]he traditional test for admiralty tort jurisdiction asked only whether the tort occurred on navigable waters. If it did, admiralty jurisdiction followed; if it did not, admiralty jurisdiction did not exist." *Grubart*, 513 U.S. at 531–32; *see also The Plymouth*, 70 U.S. 20, 36 (1866) ("Every species of tort, however occurring, and whether on board a vessel or not, if upon the high seas or navigable waters, is of admiralty cognizance.").

In 1948, however, Congress expanded this narrow rule when it enacted the Extension of Admiralty Jurisdiction Act, which provides that

> [t]he admiralty and maritime jurisdiction of the United States extends to and includes cases of injury or damage, to person or property, caused by a vessel on navigable waters, even though the injury or damage is done or consummated on land.

15

46 U.S.C. § 30101(a). As the Supreme Court explained, "[t]he purpose of the Act was to end concern over the sometimes confusing line between land and water, by investing admiralty with jurisdiction over 'all cases' where the injury was caused by a ship or other vessel on navigable water, even if such injury occurred on land." *Grubart*, 513 U.S. at 532.

"After this congressional modification to gather the odd case *into* admiralty," a series of four Supreme Court cases tinkered with the traditional locality test to "keep[] a different class of odd cases *out*." *Id.* (emphasis added). In the first case, *Executive Jet Aviation, Inc. v. City of Cleveland*, a plane crashed into Lake Erie after its jet engines inhaled a flock of seagulls shortly after takeoff from Burke Lakefront Airport in Cleveland, Ohio. 409 U.S. 249, 250 (1972). Because the plane crashed into navigable waters, admiralty jurisdiction arguably existed under the locality test.[7] But the Court observed "that 'a purely mechanical application of the locality test' was not always 'sensible' or 'consonant with the purposes of maritime law,' as when (for example) the literal and universal

---

[7] We say arguably because the Court did not decide precisely where the tort (as opposed to the crash) occurred for purposes of applying the locality test. *See Exec. Jet*, 409 U.S. at 267 ("In the view we take of the question before us, we need not decide who has the better of this dispute.").

application of the locality rule would require admiralty courts to adjudicate tort disputes between colliding swimmers." *Grubart*, 513 U.S. at 533 (citation omitted) (quoting *Exec. Jet*, 409 U.S. at 261).

In light of this concern, the Court decided to pull back on the locality test, at least in the aviation context. The Court noted that, "[u]nlike waterborne vessels, [aircraft] are not restrained by one-dimensional geographic and physical boundaries. For this elementary reason, [the Court] conclude[d] that the mere fact that the alleged wrong 'occurs' or 'is located' on or over navigable waters— whatever that means in an aviation context—is not of itself sufficient to turn an airplane negligence case into a 'maritime tort.'" *Exec. Jet*, 409 U.S. at 268. Rather, the *Executive Jet* Court believed "[i]t [was] far more consistent with the history and purpose of admiralty to require also that the wrong bear a significant relationship to traditional maritime activity." *Id.* It therefore held "that unless such a relationship exists, claims arising from airplane accidents are not cognizable in admiralty in the absence of legislation to the contrary." *Id.* In so holding, the Court adopted, at least in the aviation context, the position of several lower courts that "a maritime locality is not sufficient to bring the tort within

17

federal admiralty jurisdiction, but that there must also be a maritime nexus—some relationship between the tort and traditional maritime activities, involving navigation or commerce on navigable waters." *Id.* at 256.

Although the Court clearly limited *Executive Jet*'s holding to the "aviation context," that did not stop lower courts from extending its reasoning—particularly the maritime nexus requirement—to other circumstances, an extension the Court expressly endorsed in *Foremost Insurance Co. v. Richardson*, 457 U.S. 668 (1982). In that case, two pleasure boats collided on the Amite River in Louisiana. *Id.* at 669. Although the Court "conceded that pleasure boats themselves had little to do with the maritime commerce lying at the heart of the admiralty court's basic work," it "nonetheless found the necessary relationship," i.e., maritime nexus, "in '[t]he potential disruptive impact [upon maritime commerce] of a collision between boats on navigable waters, when coupled with the traditional concern that admiralty law holds for navigation.'" *Grubart*, 513 U.S. at 533 (alterations in original) (quoting *Foremost*, 457 U.S. at 675). The Court elaborated that "if these two boats collided at the mouth of the St. Lawrence Seaway, there would be a substantial effect on maritime commerce, without

18

regard to whether either boat was actively, or had been previously, engaged in commercial activity." *Foremost*, 457 U.S. at 675.[8]

The Court thus held that *Executive Jet*'s maritime nexus requirement could be satisfied if the incident in question has a *potentially* disruptive effect on maritime commerce, which would be the case for the recreational-vessel collision in *Foremost*. *See Grubart*, 513 U.S. at 533 (explaining *Foremost*). This conclusion was based at least in part on the Court's view that, "[a]lthough the primary focus of admiralty jurisdiction is unquestionably the protection of maritime commerce, . . . . [t]he federal interest in protecting maritime commerce . . . can be fully vindicated only if *all* operators of vessels on navigable waters are subject to uniform rules of conduct." *Foremost*, 457 U.S. at 674–75. In a footnote, however, the Court remarked that "[n]ot every accident in navigable waters that might disrupt maritime commerce will support federal admiralty jurisdiction." *Id.* at 675 n.5. Rather, it is only "when this kind of potential hazard to maritime commerce arises out of activity that bears a substantial relationship to traditional maritime

---

[8] As one district court later pointed out, "[s]ince the mouth of the St. Lawrence Seaway is miles wide and the colliding pleasure boats were small, [*Foremost*'s] example of a potential disruptive effect upon maritime commerce takes the concept about as far as it can go." *Roane v. Greenwich Swim Comm.*, 330 F. Supp. 2d 306, 315 (S.D.N.Y. 2004).

activity, as [did] the navigation of the boats in [*Foremost*], [that] admiralty jurisdiction is appropriate." *Id.*

Eight years later, this footnote would morph into the modern multi-part test for admiralty tort jurisdiction. In *Sisson v. Ruby*, the Court was called upon to decide whether admiralty jurisdiction extends to tort claims arising after a defective washer/dryer caught fire on a pleasure boat docked at a marina, with the resulting fire burning the pleasure boat, other boats docked nearby, and the marina itself. 497 U.S. at 360. In concluding that admiralty jurisdiction covered the claims related to this fire, the Court separated *Foremost*'s footnote discussing the maritime nexus requirement into two components. *See Grubart*, 513 U.S. at 533. Under the *Sisson* test, after determining that the location test is satisfied, courts must first "determine the potential impact of a given type of incident by examining its general character" and whether this type of incident is "likely to disrupt [maritime] commercial activity." *Sisson*, 497 U.S. at 363. Second, "the party seeking to invoke maritime jurisdiction must show a substantial relationship between the activity giving rise to the incident and traditional maritime activity." *Id.* at 364.

The Court explained that the first part of the connection "inquiry does not turn on the *actual* effects on maritime commerce" of a particular incident; "[r]ather, a court must assess the general features of the type of incident involved to determine whether such an incident is likely to disrupt commercial activity." *Id.* at 363. For example, the Court described the general features of the incident in *Sisson* as "a fire on a vessel docked at a marina on navigable waters," in *Executive Jet* as "an aircraft sinking in the water," and in *Foremost* as "a collision between boats on navigable waters." *Sisson*, 497 U.S. at 363.

The Court further explained that, under the second part of the connection inquiry, "the relevant 'activity' is defined not by the particular circumstances of the incident, but by the general conduct from which the incident arose." *Id.* at 364. For example, in *Sisson*, "the relevant activity was the storage and maintenance of a vessel at a marina on navigable waters," in *Executive Jet*, "the relevant activity was not a plane sinking in Lake Erie, but air travel generally," and in *Foremost*, the "relevant activity [was] navigation of vessels generally." *Sisson*, 497 U.S. at 364–65. Under this second prong, the *Sisson* Court reiterated *Foremost*'s lesson that "[t]he fundamental interest giving rise to maritime jurisdiction is the protection of

maritime commerce and . . . that interest cannot be fully vindicated unless *all* operators of vessels on navigable waters are subject to uniform rules of conduct." *Id.* at 367 (citations and quotation marks omitted). Moreover, "[t]he need for uniform rules of maritime conduct and liability is not limited to navigation, but extends at least to any other activities traditionally undertaken by vessels, commercial or noncommercial." *Id.* The *Sisson* Court "conclude[d] that, just as navigation, storing and maintaining a vessel at a marina on a navigable waterway is substantially related to traditional maritime activity." *Id.*

Finally, in *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, the Court considered whether admiralty jurisdiction extended to claims related to flooding in the downtown Chicago Loop after operators of a crane sitting on a barge in the Chicago River drove piles into the riverbed above an underwater tunnel, allegedly weakening the tunnel and causing the flooding. 513 U.S. at 529. Before upholding admiralty jurisdiction on such facts, the Court affirmed and further developed the *Sisson* test, explaining that, under "*Sisson*, . . . a party seeking to invoke federal admiralty jurisdiction . . . over a tort claim must satisfy conditions both of location and of connection with maritime activity." *Id.* at 534. First, "[a]

22

court applying the location test must determine whether the tort occurred on navigable water or whether injury suffered on land was caused by a vessel on navigable water." *Id.*[9] Second, in applying the connection test, the court examines two issues: (1) the court "must assess the general features of the type of incident involved to determine whether the incident has a potentially disruptive impact on maritime commerce"; and (2) the "court must determine whether the general character of the activity giving rise to the incident shows a substantial relationship to traditional maritime activity." *Id.* at 534 (citations and quotation marks omitted).

The *Grubart* Court further explained that the first connection prong "turns . . . on a description of the incident at an intermediate level of possible generality," *id.* at 538, focusing on "the 'general features' of the incident," *id.* at 539. The Court elaborated that, "[a]lthough there is inevitably some play in the joints in selecting the right level of generality when applying the *Sisson* test, the

---

[9] The location part of the modern test effectively incorporates the traditional locality rule, which does not turn on the involvement of a vessel, *see The Plymouth*, 70 U.S. at 36, plus the Extension of Admiralty Jurisdiction Act, which does, *see* 46 U.S.C. § 30101(a).

inevitable imprecision is not an excuse for whimsy." *Id.* at 542.[10] In *Grubart*, the

Court concluded, "the 'general features' of the incident at issue here may be

described as damage by a vessel in navigable water to an underwater structure."

*Id.* at 539.

In contrast, the second connection prong turns on "whether the general

character of the activity giving rise to the incident shows a substantial

relationship to traditional maritime activity," and courts should "ask whether a

tortfeasor's activity, commercial or noncommercial, on navigable waters is so

closely related to activity traditionally subject to admiralty law that the reasons

for applying special admiralty rules would apply in the suit at hand." *Id.* at 539–

40. "Navigation of boats in navigable waters clearly falls within the substantial

relationship, *Foremost*; storing them at a marina on navigable waters is close

enough, *Sisson*; whereas in flying an airplane over the water, *Executive Jet*, as in

swimming, the relationship is too attenuated." *Id.* at 540 (citations omitted). In

*Grubart*, "the 'activity giving rise to the incident' . . . [was] characterized as repair

or maintenance work on a navigable waterway performed from a vessel," which,

---

[10] Whimsy, like beauty, is often in the eye of the beholder, but the Court provided no additional guidance as to how lower courts should select the right level of generality.

the Court concluded, also fell within the substantial relationship. *Id.* (quoting

*Sisson*, 497 U.S. at 364).

In affirming the complicated *Sisson* test, however, the *Grubart* Court also

cautioned that *Sisson* should be viewed as "a test to weed out torts without a

maritime connection," not "an arbitrary exercise for eliminating jurisdiction over

even vessel-related torts connected to traditional maritime commerce." *Id.* at 542

n.4. In other words, "[a]lthough the [modern test] tempers the locality test with

the added requirements looking to potential harm and traditional activity, it

reflects customary practice in seeing jurisdiction as the norm when the tort

originates with a vessel in navigable waters, and in treating departure from the

locality principle as the exception." *Id.* at 547.

To drive this point home, the Court devoted considerable attention to the

criticism that "[i]f the activity at issue [in *Grubart*] [was] considered maritime

related, . . . then virtually 'every activity involving a vessel on navigable waters'

would be 'a traditional maritime activity sufficient to invoke maritime

jurisdiction.'" *Id.* at 542 (quoting Grubart Br. 6). The Court responded bluntly that

"this is not fatal criticism," because the Court "ha[d] not proposed any radical

alteration of the traditional criteria for invoking admiralty jurisdiction in tort cases." *Id.* Rather, the Court explained that it "ha[d] simply followed the lead of the lower federal courts in rejecting a location rule so rigid as to extend admiralty to a case involving an airplane, not a vessel, engaged in an activity far removed from anything traditionally maritime." *Id.* It further remarked:

> In the cases after *Executive Jet*, the Court stressed the need for a maritime connection, but found one in the navigation or berthing of pleasure boats, despite the fact that the pleasure boat activity took place near shore, where States have a strong interest in applying their own tort law, or was not on all fours with the maritime shipping and commerce that has traditionally made up the business of most maritime courts. Although we agree with petitioners that these cases do not say that every tort involving a vessel on navigable waters falls within the scope of admiralty jurisdiction no matter what, *they do show that ordinarily that will be so.*

*Id.* at 543 (emphasis added) (citations omitted).

We recently applied the *Executive Jet* line of cases in *Tandon*, which involved a brawl on a marina dock, with some of the brawlers falling into the surrounding navigable waters—the type of "perverse and casuistic borderline situation[]" that could have satisfied the locality test and that the modern test was designed to exclude. *Tandon*, 752 F.3d at 248 (quoting *Exec. Jet*, 409 U.S. at 255). Applying the *Grubart* test, we held that admiralty jurisdiction did not reach the claims relating

to this brawl "because this type of incident does not have a potentially disruptive effect on maritime commerce." *Id.* at 240.

After summarizing the *Executive Jet* line of cases, we restated the *Grubart* test as follows:

> First, we ask whether the alleged tort meets the location test: that is, whether it occurred on navigable water or was caused by a vessel on navigable water. Second, we ask whether the alleged tort meets both subparts of the connection test: that is, whether the general type of incident involved has a potentially disruptive effect on maritime commerce, and whether the general character of the activity giving rise to the incident bears a substantial relationship to traditional maritime activity. Only if the location test and both subparts of the connection test are met will admiralty tort jurisdiction be proper under 28 U.S.C. § 1333(1).

*Id.* at 248 (citation omitted). Later in that opinion, we explained that "[t]he first part of the connection test looks to the nature of the incident that immediately caused the underlying injury; the second part, by contrast, looks to the nature of the broader activity giving rise to that incident." *Id.* at 250–51.

Applying the first part of the connection test, we noted that "[t]he overall purpose of the exercise is to determine 'whether the incident could be seen within a class of incidents that pose[] more than a fanciful risk to commercial shipping.'" *Id.* at 249 (quoting *Grubart*, 513 U.S. at 539). "We conclude[d] that the incident at

27

issue in [that] case [was] best described as a physical altercation among recreational visitors on and around a permanent dock surrounded by navigable water." *Id.*

After so defining the incident, "[w]e conclude[d] that this type of incident does not realistically pose a threat to maritime commerce," for four reasons: (1) "a fistfight on and around a dock cannot immediately disrupt navigation"; (2) "a fistfight on a dock cannot immediately damage nearby commercial vessels"; (3) "the class of incidents we consider[ed] [t]here include[d] only fights on permanent docks" that "d[id] not pose the same risks to maritime commerce as a fistfight occurring on a vessel on navigable water"; and (4) "the class of incidents we consider[ed] [t]here involve[d] only physical altercations among recreational visitors, not persons engaged in maritime employment." *Id.* at 249–50. Because we concluded that the incident failed to satisfy the first part of the *Grubart* connection inquiry, we ended our analysis there. *Id.* at 253 n.10.

Responding to the argument that "the struggling bodies could themselves pose a navigational hazard," *id.* at 251, we noted that, "[a]t worst, an incident of this sort might temporarily prevent commercial vessels from mooring at the

permanent dock around which the fight occurred. But the potential impact of such a temporary disruption is simply too meager to support jurisdiction," *id.* at 252 (citation omitted). And in response to the argument that "a fight on a dock surrounded by navigable water may require emergency responders to come to the dock by boat and leave by boat, potentially snarling naval traffic in nearby waters[,] [w]e recognize[d] that other courts have found the potentially disruptive impact of a maritime emergency response enough to satisfy the first part of the connection test in some cases," but "[t]hose cases . . . generally dealt with incidents occurring either aboard a vessel or else in open water." *Id.* We further acknowledged that "[w]here such an incident takes place on a vessel or in open water far from the shore, the potential danger to commercial shipping posed by a maritime emergency response may be more significant." *Id.*

**B.**

The alleged tort here involves a vessel on navigable waters—factors the Supreme Court has reminded us will ordinarily place a case within the bounds of admiralty jurisdiction. *See Grubart*, 513 U.S. at 543. Nonetheless, the district court applied the *Grubart* test and concluded that admiralty jurisdiction was lacking,

emphasizing the recreational nature of the vessel and its passengers as well as the location of the incident in shallow waters. We disagree that these factors remove the case from admiralty jurisdiction.

**1.**

Working through the *Grubart* test, the district court began by noting that "the parties agree the location test has been met since the alleged tort occurred on a navigable body of water, Oneida Lake." *Ficarra*, 91 F. Supp. 3d at 313.

Turning to the first step of the connection test—whether the general type of incident involved has a potentially disruptive effect on maritime commerce—the district court set forth a general description of the incident, which, as noted, must be described at an "intermediate level of possible generality." *Grubart*, 513 U.S. at 538. The district court found "that the incident is best described as an injury to a recreational passenger who jumped from a recreational vessel in a shallow recreational bay of navigable waters." *Ficarra*, 91 F. Supp. 3d at 314.

This description is hardly a fit of "whimsy," *Grubart*, 513 U.S. at 542, but we explained in *Tandon* that the description of the incident at an intermediate level of possible generality should be "neither too general to distinguish different cases

30

nor too specific to the unique facts of the particular case," 752 F.3d at 247. An overly particularized description will invite future litigation over even the smallest change to the fact pattern, even if that change has little bearing on whether federal courts should or should not exercise admiralty jurisdiction. The description should therefore be "general enough to capture the possible effects of similar incidents on maritime commerce." *Id.* at 249. In this regard, we respectfully believe the district court's description is unnecessarily specific.

First, the Supreme Court has consistently stated that it does not matter for purposes of admiralty tort jurisdiction whether the vessel involved was used for commercial or recreational purposes. *See Foremost*, 457 U.S. at 674–75; *see also Yamaha Motor Corp., U.S.A. v. Calhoun*, 516 U.S. 199, 206 (1996) (holding admiralty jurisdiction extends to jet ski accident). This is so because the federal "interest can be fully vindicated only if *all* operators of vessels on navigable waters are subject to uniform rules of conduct." *Foremost*, 457 U.S. at 675; *see also* 1 Thomas J. Schoenbaum, *Admiralty and Maritime Law* § 3-3 at 130–31 (5th ed. 2011) ("Thus, the current test extends admiralty jurisdiction to pleasure craft, but only if they are

31

operating on a waterway with *commercial* navigability."). The district court's emphasis on the recreational nature of Germain's vessel is therefore misplaced.

Second, the Supreme Court has never indicated that it matters whether the navigable waters at issue were shallow or deep. That the Court has not discussed the depth of navigable waters is unsurprising because "[t]he basic test of navigability for purposes of admiralty jurisdiction is the formula of *The Daniel Ball*, [77 U.S. 557 (1870),]" and that formula requires, among other things, "proof of present or potential *commercial* shipping." 1 Schoenbaum, *supra*, § 3-3 at 125–27. "As long as such commercial activity is proved, the particular mode of travel or type of craft—flatboat, barge, power vessel, or other method—is unimportant . . . ." *Id.* § 3-3 at 127. If navigability is satisfied, then, it should matter very little for purposes of the first connection prong whether the navigable waters were shallow or deep.

We noted in *Tandon* that, "in considering the type of incident involved, the location of the incident may be relevant," 752 F.3d at 251, but there we focused on the distance from shore or, more accurately, the distance from the nearest dock or marina, rather than the depth of the waters. Specifically, in assessing the potential

32

effects on maritime commerce, we noted that "[a]n emergency response to an incident on and around a floating dock is . . . much less likely to ensnarl maritime traffic than an emergency response to an incident on a vessel or an incident in open water." *Id.* at 252 (citation and quotation marks omitted). The incident here, unlike the incident on and around a dock in *Tandon*, occurred on a vessel and in open water.

Third, the district court also relied on *Tandon*'s observation that "the roles of the persons involved . . . can be relevant to the potential effect on maritime commerce." *Ficarra*, 91 F. Supp. 3d at 314 (quoting *Tandon*, 752 F.3d at 249). But, as noted, the focus under the first prong of the modern test is on capturing possible effects of similar incidents on maritime commerce. Where similar incidents involving different types of persons produce similar effects that have a potentially disruptive effective on maritime commerce, the type of person involved should be omitted from the incident's description. As discussed in greater detail below, the potential effects on maritime commerce of an injury to a passenger who jumped from a vessel on open navigable waters include collisions with commercial vessels caused by distracted crews and disruption to maritime traffic caused by

maritime rescue. These potential effects may be the same whether the injured passenger was recreational or employed in maritime commerce, and they are also sufficient to satisfy the test. Of course, the loss of a maritime employee may have an additional effect on maritime commerce. *See Tandon*, 752 F.3d at 250 (collecting cases). But, at least here, that additional effect does not change the outcome of the first connection prong, which would be satisfied regardless of the type of persons involved.

Accordingly, we think a more appropriate description of the incident, described at an intermediate level of possible generality and general enough to capture the possible effects of similar incidents on maritime commerce, is injury to a passenger who jumped from a vessel on open navigable waters. "This description accurately captures the nature of the event giving rise to this suit, and the type of risks that the incident could pose to maritime commerce." *Id.* at 249.

"[L]ook[ing] not to the particular facts of the case before us—i.e., whether maritime commerce was actually disrupted here—but to whether similar occurrences are likely to be disruptive," *id.*, we conclude that the incident satisfies the first connection prong. First, the district court concluded that the incident

would not pose more than a fanciful threat to maritime commerce largely because

the location of the incident was in "shallow, recreational bays—waters unsuitable

for commercial shipping. Therefore, even if the crew of the vessel was distracted

by the passenger jumping overboard, there would be no risk of collision with

commercial vessels." *Ficarra*, 91 F. Supp. 3d at 314.[11] To begin with, the district

court appears to have assumed that commercial means large, but commercial

vessels could include small or flat-bottom vessels used for commercial purposes

(e.g., fishing boats or boats taking paying passengers to shallow, hard-to-reach

bays for snorkeling, diving, etc.). *Cf. Sinclair v. Soniform, Inc.*, 935 F.2d 599, 600 (3d

Cir. 1991) (holding that scuba diver's claims against the crew of the vessel that

transported him to a diving site fell within admiralty jurisdiction).

Moreover, the Supreme Court has taken an expansive view of the possible

commercial effects caused by collisions of even small recreational vessels on

navigable waters, regardless of the precise location of those vessels in relation to

commercial traffic. In *Foremost*, for example, the Court "supported [its] finding of

---

[11] If the shallow waters were in fact unsuitable for commercial shipping, we do not see how the navigability component of the location test would be satisfied because, as noted, navigability for admiralty purposes requires "proof of present or potential *commercial* shipping." 1 Schoenbaum, *supra*, § 3-3 at 127.

potential disruption . . . with a description of the likely effects of a collision at the mouth of the St. Lawrence Seaway, an area heavily traveled by commercial vessels, even though the place where the collision actually had occurred apparently was 'seldom, if ever, used for commercial traffic.'" *Sisson*, 497 U.S. at 363 (citation omitted) (quoting *Foremost*, 457 U.S. at 670 n.2). We similarly conclude that the crew of a vessel, commercial or recreational, on open navigable waters could become distracted when a passenger is injured from jumping overboard and that the distraction could risk collision with a commercial vessel. *See Roane v. Greenwich Swim Comm.*, 330 F. Supp. 2d 306, 315 (S.D.N.Y. 2004) ("[T]hose on board a boat . . . giving their full attention to the saving of the life of a swimmer in difficulty may well be distracted from hazards posed by the approach of other boats unaware of the rescue in progress, or coming at speed in an effort to assist.").

Second, the district court rejected Germain's argument "that this type of incident may still potentially disrupt maritime commerce because an injured passenger in navigable waters invites rescue." *Ficarra*, 91 F. Supp. 3d at 315 (quotation marks omitted). Although the district court recognized that some

36

courts have accepted this argument, it found that "those cases typically involve rescue at sea or far from shore where the potential risk of an emergency response to snarl commercial shipping traffic is more realistic." *Id.* (citing *Roane*, 330 F. Supp. 2d at 314; *Szollosy v. Hyatt Corp.*, 208 F. Supp. 2d 205, 212 (D. Conn. 2002)).

But the incident on open navigable waters here is more comparable to a rescue at sea than a rescue at or near a dock. One of the reasons we held in *Tandon* that rescue of brawlers on or near a dock was unlikely to ensnarl maritime traffic was that "[e]mergency responders may have to travel by boat to reach persons injured near a permanent dock, but they will never have to travel far. And once the emergency responders arrive at the scene, they can moor their vessel at the permanent dock, rather than having to focus simultaneously on navigating their vessel and rescuing the injured." 752 F.3d at 252. In contrast, rescue of passengers injured on a vessel on open navigable waters will often come not from shore, dock, or docked vessels but from other vessels on those same navigable waters. Here, for example, Ficarra was allegedly rescued by boat and rushed five nautical miles across Lake Oneida back to Brewerton through a federal shipping lane. Such maritime rescues on open navigable waters could divert resources that

would be called upon in the event of an incident involving a commercial vessel, require commercial boats themselves to aid in the rescue efforts, or otherwise disrupt commercial shipping by, for example, using federal shipping lanes to transport injured passengers to safety. *See Craddock v. M/Y The Golden Rule*, 110 F. Supp. 3d 1267, 1275 (S.D. Fla. 2015); *Polly v. Estate of Carlson*, 859 F. Supp. 270, 272 (E.D. Mich. 1994); *In re Complaint of Bird*, 794 F. Supp. 575, 580 (D.S.C. 1992); *cf. Foremost*, 457 U.S. at 675.

Based on similar reasoning, at least three circuits have relied on the potentially disruptive effect of a maritime emergency response to sustain admiralty jurisdiction, even when the activity or vessels at issue were recreational. *See, e.g.*, *In re Mission Bay Jet Sports, LLC*, 570 F.3d 1124, 1129–30 (9th Cir. 2009); *Ayers v. United States*, 277 F.3d 821, 827–28 (6th Cir. 2002); *Sinclair*, 935 F.2d at 602. We distinguished these cases in *Tandon* on the grounds that they "generally dealt with incidents occurring either aboard a vessel or else in open water," and we further noted that "[w]here such an incident takes place on a vessel or in open water far from the shore, the potential danger to commercial

shipping posed by a maritime emergency response may be more significant." 752

F.3d at 252. As discussed above, those factors are present here.

We therefore conclude that the general type of incident involved here—

injury to a passenger who jumped from a vessel on open navigable waters—has a

potentially disruptive effect on maritime commerce.

**2.**

The district court further concluded that even if it went to the next step—

whether the general character of the activity giving rise to the incident shows a

substantial relationship to traditional maritime activity—"admiralty jurisdiction

would still not lie." *Ficarra*, 91 F. Supp. 3d at 315. We respectfully disagree.

Under this second step, the district court properly began by "describ[ing]

the 'general character' of the alleged tortfeasor's activity which gave rise to the

incident." *Id.* (quoting *Grubart*, 513 U.S. at 539). The district court described

"Germain's alleged activity which gave rise to the incident . . . as anchoring a

recreational vessel in a shallow recreational bay without adequately warning a

passenger about the risks of diving in." *Id.* at 316. It then concluded that this

activity "is not 'so closely related to activity traditionally subject to admiralty law

39

that the reasons for applying special admiralty rules would apply in the suit at hand.'" *Id.* at 316 (quoting *Grubart*, 513 U.S. at 539).

We believe a more accurate description of the "general character" of Germain's activity was the transport and care of passengers on board a vessel on navigable waters, which more generally captures the many aspects of Germain's activity that Ficarra alleges gave rise to his injury (e.g., Germain's failure to: operate, captain, anchor, maintain, or control his boat in a manner necessary to protect the safety of his passengers; instruct passengers on safe boating and diving; inspect the area where the boat was anchored; and warn passengers about the conditions where the boat was anchored). And contrary to the district court's suggestion, the activity in question need not be "on all fours with the maritime shipping and commerce that has traditionally made up the business of most maritime courts," particularly when the activity in question concerns a vessel on navigable waters. *Grubart*, 513 U.S. at 543.

In any event, we conclude that the activities at issue here—whether it is the more general transport and care of passengers on a vessel on navigable waters or the more specific anchoring of a vessel without warning of the attendant

40

dangers—are substantially related to traditional maritime activity. *Cf. Sinclair*, 935 F.2d at 602 ("[T]he transport and care of passengers bears a substantial relationship to traditional maritime activity . . . ."); *Kelly v. Smith*, 485 F.2d 520, 526 (5th Cir. 1973) ("Admiralty has traditionally been concerned with furnishing remedies for those injured while traveling navigable waters."), *abrogated on other grounds as stated in Grubart*, 513 U.S. at 544; *Bird*, 794 F. Supp. at 581 ("The court finds . . . that the anchoring of a boat in navigable waters is a traditional maritime activity and that therefore, the second prong is also satisfied."); 1 *Benedict on Admiralty* § 171 at 11-20 (7th ed. rev. 2015) ("Injuries to passengers on excursion boats or other vessels for hire arising out of the fault of the vessel operator or owner are maritime even though there is nothing uniquely maritime about the type of injury." (collecting cases)).[12]

---

[12] In concluding that Germain's activity lacked a substantial relationship to traditional maritime activity, the district court relied on two cases that have been called into doubt: *Delta Country Ventures, Inc. v. Magana*, 986 F.2d 1260 (9th Cir. 1993), and *Foster v. Peddicord*, 826 F.2d 1370 (4th Cir. 1987). The Ninth Circuit held that "the *Delta Country Ventures* approach is flatly inconsistent with the Supreme Court's subsequent decision in *Grubart* and hence is no longer good law." *Taghadomi v. United States*, 401 F.3d 1080, 1087 (9th Cir. 2005). Although the Fourth Circuit has not overruled *Foster*, its approach also seems inconsistent with subsequent Supreme Court authority and lower courts in the Fourth Circuit have declined to follow it for that reason. *See Bird*, 794 F. Supp. at 580.

41

In sum, we hold that the claims related to the alleged facts here fall within the scope of admiralty tort jurisdiction. First, the underlying claim meets the location test as it occurred on navigable waters. Second, the underlying claim meets both parts of the connection test: (1) The general type of incident—injury to a passenger who jumped from a vessel on open navigable waters—has a potentially disruptive effect on maritime commerce; and (2) the general character of the activity giving rise to the incident—whether described as the transport and care of passengers on a vessel on navigable waters or the anchoring of a vessel without warning of the attendant dangers—bears a substantial relationship to traditional maritime activity.

## C.

At oral argument, Germain urged us to adopt a simpler rule and hold that admiralty jurisdiction extends to all torts originating on a vessel on navigable waters. We agree that, in general, courts should strive to adopt clear legal rules, particularly in the context of jurisdiction—fewer things are more wasteful to litigate than where you can litigate. *Cf. Grubart*, 513 U.S. at 549 (Thomas, J., concurring) ("The faults of balancing tests are clearest, and perhaps most

destructive, in the area of jurisdiction."). And in this respect, the modern test for admiralty tort jurisdiction leaves something to be desired.

Lower courts have exerted considerable effort to make sense of the test, while lamenting its complexity and lack of clarity. *See, e.g.*, *Bird*, 794 F. Supp. at 581 n.9 ("Although the test is broad-based, it is by no means a bright line rule and therefore fails to serve as the type of clear jurisdictional rule that is so important when determining subject matter jurisdiction. The nexus test as defined in *Sisson* instead will invite confusion and inconsistent application on the part of lower courts seeking to apply it." (citation omitted)). As Judge Haight aptly observed: "Just what sort of conduct satisfies the apparently two-pronged 'connection test' the Court articulated in *Grubart* remains for consideration by district courts on a case-by-case basis, and I may perhaps be excused for saying that the Court's chart does not reveal the precise location of every hazard to jurisdictional navigation." *Roane*, 330 F. Supp. 2d at 313. The district court's thoughtful analysis here and our lengthy explanation of why it was erroneous provide only further evidence that this is so.

But the Supreme Court is well aware of the modern test's difficulties and the advantages of a simpler rule, both of which Justice Thomas fully set forth in his concurring opinion in *Grubart*. *See* 513 U.S. at 549–556 (Thomas, J., concurring). We need not repeat those arguments here, but they do inform our decision not to adopt the simpler rule that Germain urged us to consider. Most obviously, Justice Thomas's concurrence in *Grubart* advocated a rule similar to the one that Germain seeks here. *See id.* at 555 (Thomas, J., concurring) ("When determining whether maritime jurisdiction exists under § 1333(1), a federal district court should ask if the tort occurred on a vessel on the navigable waters."). However persuaded we might be by Justice Thomas's concurrence, a majority of the *Grubart* Court was not so persuaded, and it is the majority's opinion that we must follow. We therefore decline Germain's invitation to adopt a simpler rule, and we instead apply the test set forth by the *Grubart* majority.

### Conclusion

For the foregoing reasons, we conclude that Germain's appeal of the dismissal of his petition seeking exoneration from or limitation of liability was proper, and we also conclude that the district court has jurisdiction over that

44

petition. We therefore REVERSE and REMAND for further proceedings

consistent with this opinion.